**ANDERSON & KARRENBERG**
Jason Greene (Utah Bar No. 13990)
Broadway Media Building
50 West Broadway, Suite 700
Salt Lake City, UT 84101
Email: jgreene@aklawfirm.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (*pro hac vice application forthcoming*)
501 Fifth Avenue South, 19th Floor
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

---

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MELVYN KLEIN, Derivatively on Behalf of CO-DIAGNOSTICS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>DWIGHT H. EGAN, REED L. BENSON, BRENT SATTERFIELD, EUGENE DURENARD, EDWARD MURPHY, JAMES NELSON, AND RICHARD S. SERBIN,<br><br>Defendants,<br><br>and<br><br>CO-DIAGNOSTICS, INC.,<br><br>Nominal Defendant | **COMPLAINT**<br><br>Case No: 2:20-cv-00850-DBB<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Melvyn Klein ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' (defined below) public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Co-Diagnostics, Inc. ("Co-Diagnostic" or the "Company"), legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and/or officers from February 25, 2020 through the present (the "Relevant Period").

2.     As the Covid-19 global pandemic spread to the United States, government and public health officials on the state and federal levels moved to establish strategies to prevent the disease from devastating the country.   Those government strategies were predicated on establishing effective systems for mass testing of the U.S. population for Covid-19.

3.     Fast, accurate, and readily accessible testing for Covid-19 provides government officials with crucial health information and data needed to combat the pandemic.  It allows them to assess, in real-time, outbreaks of the virus and to take appropriate policy actions—such as

quarantining and social distancing measures intended to prevent further mass transmission. And it allows them to allocate and, if necessary, seek resources to ensure that the public and private health systems can appropriately provide care for Covid-19 patients who require medical intervention and treatment.

4.      Health officials have worked closely with U.S. and international medical and pharmaceutical companies to develop Covid-19 tests, to seek potential therapeutics for the virus, and to ultimately obtain a vaccine. And many American companies have stepped up to this tremendous challenge, working with government counterparts to mitigate and hopefully end this pandemic.

5.      There are, however, some companies and corporate executives who have sought to unfairly exploit this novel pandemic for their financial gain, including by misleading the public about the efficacy of their products in combatting the pandemic.

6.      As explained in greater detail below, the Company, its directors and officers made continual, knowing and willful misstatements about their main product, a Covid-19 diagnostic test, to pump of the price of the Company's stock while the officers and directors exercised low priced options and dumped their stock into the market. Their fraudulent misstatements, and disregard for the basic scientific principles that make their falsity of their statements clear in retrospect, cost investors to lose millions of dollars.

7.      Early in the Covid-19 pandemic, drug companies were racing to create an accurate diagnostic test for the virus that had quick response times. The Company seemingly won that race. The Company announced that it had received regulatory clearance to sell its tests in the European Community on February 24, 2020—the first company in the world to receive this clearance. Then,

on April 6, 2020 the Company announced that it had received emergency use authorization for its tests from the U.S. Food and Drug Administration ("FDA").

8.       Throughout this time, the Company, its Chief Technology Officer, and its other officers and directors made unequivocal statements to the market that its Covid-19 tests were 100% accurate — a staggering claim that appeared to set the Company apart from other competitors developing Covid-19 tests.  However, as was later revealed, this was not true:  the Company's Covid-19 tests are materially less than 100% accurate – a discrepancy that can have momentous adverse consequences if the Company's tests are used on a widespread basis, as intended. Nonetheless, the Company's market-first test, together with its claims that its tests were perfectly accurate, allowed the Company to sign lucrative contracts with state government in the U.S. and governments around the world.

9.       As a result of this misrepresentation and the influx of taxpayer dollars to the Company, the Company's stock soared.  Then, the crash came when the Company began acting evasively about its Covid-19 tests' true accuracy and regulatory authorities contradicted claims made by the Company about the accuracy of diagnostic tests.

10.      Prior to the release of the news undermining the Company's false claims of 100% accuracy, the Company's stock enjoyed an all-time high stock price of $29.72 per share and a market capitalization of over $800 million.  This was an accomplishment for a company that was at risk of being delisted from the exchange on New Year's Day, 2020, when it was trading at $.91 and was worth less than $25 million.  Just a year ago the Company was in danger of being delisted from NASDAQ on July 2, 2019 because it was consistently trading under a dollar; now it was trading at thirty times that.  The Company's officers and directors were poised to make a fortune

on the inflated stock price.

11.     On May 14, 2020, the Company was set to announce its first quarter earnings after markets closed.  However, before the markets closed and before the earnings call, news outlets reported that the Company was reticent to participate in U.S.-based testing to verify its accuracy claims.

12.     As public reports casting doubt on the Company's claims of 100% accuracy began to circulate, the stock declined rapidly.  After negative information about the Company's tests began to be reported, the stock went from its daily high of $29.52, down to $20, and hit an intraday low of $18.35 before closing at $22.13.  The losses on May 14, 2020, were so sudden that the stock stopped trading at one or two periods during the day, and its losses may have been higher but for NASDAQ's intervention.

13.     After markets closed, the Company issued an earnings report for the first quarter of 2020 and held a call that commented on the Company's future prospects.  On the call, Defendant Egan offered a stella report explaining that the Company had sold 6 million tests, and had already purchased components to manufacture an additional 20 million tests that were already ordered by customers.

14.     On the call, neither Defendant Egan nor its Chief Financial Officer, Defendant Benson, made mention of the public statements made by third parties relating to the tests' accuracy. Chief Science Officer, and inventor of the Company's technology, Defendant Satterfield, was absent from the call and did not address the allegations after boasting to the market about the Company's Covid-19 testing accuracy in press releases in the weeks leading to the Company's earnings announcement.

15.     That evening, in response to other drug companies' widely reported test accuracy struggles, financial news services began reporting that the FDA announced publicly that no Covid-19 test is 100% accurate.  Of course, this announcement by the FDA undermined the Company's claims about its tests' perfect accuracy.

16.     When markets opened on May 15, 2020, the stock slid to $15.80 per share. The stock never rebounded, and today trades at severely reduced volume for between $15 and $16 per share, with expectations that the stock will trend lower due to the company's product not being what it promised, public skepticism, and the realization by market that the Company was a flash-in-the-pan company that achieved astronomical gains by deceiving the public while it was wrestling with an unprecedented global pandemic.

17.     During this time, and with a cloud of doubt hanging over the Company's claims of accuracy, the Company's directors and officers have been rapidly exercising stock options for pennies per share and immediately selling their shares into the market reaping millions of dollars from the fraud-inflated price of the stock.  The Officers and Directors, knowing the truth of the company's products and its future prospects, are taking their profits at cost to the public markets before the Company inevitably becomes a penny stock once more.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims based on violations of the

Securities Exchange Act of 1934 (the "Exchange Act") made in the Securities Class Action (defined below).

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court on the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Utah or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.   **PARTIES**

### A.     **Plaintiff**

24.     Plaintiff is a current shareholder of the Company common stock.  Plaintiff purchased his first share of Co-Diagnostic stock on February 27, 2020.  Plaintiff has continuously held the Company common stock at all relevant times and is prepared to hold his Company stock throughout the duration of this litigation.  Plaintiff is a citizen of New York.

### B.     **Nominal Defendant Co-Diagnostic**

25.     ***Nominal Defendant*** is a Utah corporation with its principal executive offices at

2401 S. Foothill Drive, Suite D, Salt Lake City, Utah 84109.

      **C.**    **Director Defendants**

     26.    ***Defendant Dwight H. Egan*** ("Egan") has served as Chief Executive Officer ("CEO") and a director of the Company since 2013. Defendant Egan is a defendant in the securities class action entitled <u>Gelt Trading, Ltd. v. Co- Diagnostics, Inc., et al.</u>, Case No. 2:20-cv-00368-JNP-DBP (the "Securities Class Action"). Upon information and belief, Defendant Egan is a citizen of Utah.

     27.    ***Defendant Eugene Durenard*** ("Durenard") has served as a director of the Company since June 2019. Defendant Durenard is a defendant in the Securities Class Action. Defendant Durenard is Chair of the Audit Committee and is a member of the Corporate Governance and Nominating Committee and the Compensation Committee. Upon information and belief, Defendant Durenard is a citizen of Utah.

     28.    ***Defendant Edward L. Murphy*** ("Murphy") has served as a director of the Company since June 2019. Defendant Murphy is a defendant in the Securities Class Action. Defendant Murphy is Chair of the Corporate Governance and Nominating Committee and is a member of the Audit and Compensation Committees. Upon information and belief, Defendant Murphy is a citizen of Utah.

     29.    ***Defendant James Nelson*** ("Nelson") has served as a director of the Company since August 2019. Defendant Nelson is a defendant in the Securities Class Action. Upon information and belief, Defendant Nelson is a citizen of Utah.

     30.    ***Defendant Richard S. Serbin*** ("Serbin") has served as a director of the Company since May 2017. Defendant Serbin is a defendant in the Securities Class Action. Defendant Serbin

is Chair of the Compensation Committee and is a member of the Audit Committee and the Corporate Governance and Nominating Committee.  Upon information and belief, Defendant Serbin is a citizen of Utah.

31.     Defendants Egan, Durenard, Murphy, Nelson and Serbin are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

32.     ***Defendant Reed L. Benson*** ("Benson") has served as Chief Financial Officer ("CFO") of the Company since November 2014.  Defendant Benson was a director from November 2014 to May 2017.  Defendant Benson is a defendant in the Securities Class Action. Upon information and belief, Defendant Benson is a citizen of Utah.

33.     ***Defendant Brent Satterfield*** ("Satterfield") has served as Chief Science Officer ("CSO") of the Company since April 2013.  Defendant Satterfield is a defendant in the Securities Class Action.  Upon information and belief, Defendant Satterfield is a citizen of Utah.

34.     The Director Defendants and Defendants Benson and Satterfield are collectively referred to herein s "Defendants."

## THE AUDIT COMMITTEE CHARTER

35.     The Audit Committee charter provides:

The Audit Committee shall have full access to all of the Company's books, records, facilities, and personnel, and shall have authority to conduct any investigation into any matters appropriate to fulfilling its responsibilities.

The Audit Committee may engage and compensate independent counsel and other advisors as it deems necessary to carry out its duties. The Company will provide for appropriate funding, as determined by the Audit Committee, for payment of compensation to any advisors employed by the Audit Committee.

To fulfill its responsibilities and duties, the Audit Committee shall:

**Financial Statements and Disclosures**:

1.  Review with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2.  Review with management and the independent auditor the quarterly reports of the Company prior to filing of such reports with the SEC, including the results of the independent auditor's review of the quarterly financial statements.

3.  Review with management and the independent auditor the Company's earnings press releases as well as financial information and earnings guidance provided to analysts, including the use of "pro forma" or "adjusted" non-GAAP information and its reconciliation to GAAP.

4.  Review with management any significant changes to GAAP, SEC, and other accounting standards that will impact or could impact the financial reports under review.

5.  Review with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

6.  Periodically review with management and the independent auditor the Company's application of critical accounting policies and its consistency from period to period, and the compatibility of these accounting policies with generally accepted accounting principles, and (where appropriate) the Company's provisions for future occurrences that may have a material impact on the financial statements of the Company.

7.  Review with management all material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital resources, capital reserves or significant components of revenues or expenses.

8.  Review with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including review and approval of swap transactions (which may include the

review and amendment of policies with regard to the investment of the Company's assets or foreign exchange risk management).

9.    Review with the independent auditor the matters required by Statement on Auditing Standard No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restriction on the scope of activities or access to requested information, and any significant disagreements with management.

10.   Periodically review with the independent auditor, without management being present, (a) their judgments about the quality, appropriateness, and acceptability of the Company's accounting principles and financial disclosure practices, as applied in its financial reporting, and (b) the completeness and accuracy of the Company's financial statements.

**Independent Auditor**:

1.    Have the sole responsibility to (a) select and retain an independent registered public accounting firm to act as the Company's independent auditors for the purpose of auditing the Company's annual financial statements, books, records, accounts, and internal controls over financial reporting, (b) set the compensation of the Company's independent auditors, (c) oversee the work done by the Company's independent auditors, and (d) terminate the Company's independent auditors, if necessary.

2.    Have the sole responsibility to select, retain, compensate, oversee, and terminate, if necessary, any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company.

3.    To review and discuss with the Company's independent auditors and management (a) any audit problems or difficulties, including difficulties encountered by the Company's independent auditors during their audit work (such as restrictions on the scope of their activities or their access to information), (b) any significant disagreements with management, and (c) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's auditors and management.

4.     Advise the independent auditor of its ultimate accountability to the Audit Committee and of the authority and responsibility of the Audit Committee to select, evaluate and, where appropriate, approve (subject to approval and ratification by Company stockholders) a new independent auditor for the Company.

11

5.   Require the independent auditor annually to declare relationships and/or services that may impact its objectivity and independence, consistent with PCAOB Rule 3520, and engage in an active dialogue with the independent auditor concerning any relationships and/or services so declared.

6.   Periodically (a) evaluate the qualifications, performance, and independence of the Company's independent auditors, including (i) an evaluation of the lead audit partner; and (ii) an evaluation of the regular rotation of the lead audit partner; and (b) consider regular rotation of the accounting firm serving as the Company's independent auditors.

7.   Require the independent auditor annually to provide a report describing (a) the Company's internal quality control procedures; (b) any material issues raised by the most recent Public Company Accounting Oversight Board ("PCAOB") inspection, internal quality control review or PCAOB review of the Company, or by any inquiry or investigation by governmental or professional authorities within the preceding five years with respect to one or more independent audits carried out by the Company, and any steps taken to address any such issues; and (c) all relationships between the firm and the Company or any of its subsidiaries; and to discuss with the independent auditors this report and any relationships or services that may impact the objectivity and independence of the auditors.

8.   Pre-approve all auditing services and permitted non-audit services to be provided to the Company by the Company's independent auditor, it being understood that the Audit Committee may delegate pre-approval authority to one or more of its members so long as the decisions made by such member or members are presented to the Audit Committee at its next meeting.

**Internal Auditor**:

1.   Review the appointment and replacement of the internal auditor, if Company has engaged an internal auditor.

2.   Review and approve the internal audit plan, including the plan for testing of internal control over financial reporting.

3.   Review significant reports to management prepared by, or under the direction of, the internal auditor (and management's responses).

4.   Discuss with the independent auditor and management the responsibilities, budget, and staffing of the internal audit function.

The internal auditor will report directly to the chair of the Audit Committee with a secondary reporting relationship to the Company's Chief Financial Officer for administrative purposes.

**Internal Controls**:

1.      Oversee the adequacy of the Company's system of internal controls and review with management, the internal audit department, and the Company's independent auditors the adequacy and effectiveness of the Company's internal controls, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's internal controls, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

2.      Review with the Company's Chief Financial Officer the results of quarterly Disclosure Committee meetings, including, any significant deficiencies in the design and operation of the internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

**Compliance with Legal and Regulatory Requirements**:

1.      Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal controls, or auditing matters.

2.      Establish procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

3.      Oversee the Company's compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption regulations.

4.      Oversee the Company's compliance with SEC requirements for disclosure of accountant's services and Audit Committee members and activities.

5.      Review with management and the independent auditor any correspondence with financial and accounting related regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

6.      Oversee and approve material amendments to the Company's Insider Trading Compliance Program and Insider Trading Policy.

## IV.    FALSE AND MISLEADING STATEMENTS

**Background**

36.     The Company was formed on April 18, 2013.  Upon information and belief, the Company was formed to monetize the DNA-testing technology developed by Biomedical Engineering Ph.D. Brent Satterfield.

37.     After several years of operating as a "start-up" in the private sector, the Company filed an SEC Form S-1 Registration Statement on April 28, 2017, with an attached prospectus.

38.     The prospectus described that the Company owned proprietary technology that enabled it to do DNA testing for diagnostic purposes.

39.     For instance, the prospectus stated that, as of 2017, the Company's primary source of revenue was from selling diagnostics tests for Zika Virus, Tuberculosis, Hepatitis B, Hepatitis C, Malaria, Dengue Fever, and HIV.  Its customers were primarily located in the Caribbean, in Central and South America, in North America, and in India.

40.     The Company forecasted that it would be authorized to sell Tuberculosis, Hepatitis B, and Hepatitis C tests in the European Union in 2018 and 2019.

41.     The prospectus admits that beyond 2019, the Company did not have a plan for further research and development or any target diseases that it was aiming to create diagnostic tests for but anticipated selling tests "based on need and regulatory barriers" in the United States.

42.     The stock first listed on the NASDAQ exchange on July 12, 2017 and opened at $6.  The stock slowly slid down in price to become a "penny stock" trading at less than $1 per share for extended periods.  The stock closed on December 31, 2019 at $0.8952 per share.

43.     The Company was in danger of being delisted from the NASDAQ, which requires that companies not trade below $1.00 per share to continue being listed on the exchange.

**The Covid-19 Pandemic**

44.     In late 2019, a new virus began to spread rapidly through the population in Wuhan, China.  That virus, which has become known as Covid-19, ravaged the world's economies and healthcare systems, and resulted in millions of infections and hundreds of thousands of deaths. Covid-19 can be detected by DNA-based testing.  Because the Company expertise is DNA-based testing, the world's need for accurate Covid-19 testing—to help control the spread of the virus—presented a unique opportunity to the Company to use its technology and expertise to earn money.

45.     According to the Company, it began developing Covid-19 tests rapidly using a technology called Co-Primer, which was developed and patented by Defendant Satterfield before the outbreak.  Based on public reports, the Company used the Co-Primer technology to develop a Covid-19 diagnostics test within one week.

46.     Co-Primer allegedly worked so well that the Company, despite its relatively small size, became the first company in the world to obtain the prestigious CE marking for its Covid-19 tests. The CE certification mark indicates conformity with health, safety, and environmental protection standards for products sold within the European Economic Area.

47.     The Company announced on February 24, 2020 that it had received regulatory approval to sell in the European Community.  It was the first U.S. company to receive approval

for the export to Europe of Covid-19 test kits.

48.     The Company's stock began to rise on the news.  The stock traded at over $15 per share at the end of February 2020, and at over $17 per share in early March.

49.     On April 6, 2020, the Company became the first company to receive approval from the FDA for its Covid-19 tests under an Emergency Use Authorization, which permitted the Company's tests to be used by certified clinical laboratories in the U.S. for the diagnosis of Covid-19.

50.     The stock, which in the weeks after the CE announcement, had settled to $8 per share, began to climb again.

51.     The Company rushed its product to market because it had many larger competitors who were also hurrying to get an accurate diagnostic test to market.

**Material Misrepresentations About The Company's Covid-19 Tests**

52.     After the Company obtained its certifications, it began selling millions of dollars' worth of Covid-19 tests to 50 countries and more than 12 states in the U.S.  The stock continued to climb.

53.     During this time, the Company was able to obtain lucrative contracts to provide testing to states and foreign countries.  For instance, the Company was going to provide the majority of the tests for a $5 million contract with the state of Utah that ran from March 31, 2020 through May 30, 2020.  The Company was also to provide tests for a contract with Iowa totaling $26 million for approximately 540,000 testing kits.

54.     However, not all news was good.  On April 30, 2020, The Salt Lake Tribune published an article entitled "'This is a Potential Public Health Disaster': COVID-19 results from

TestUtah.com are raising questions."  The article questioned the accuracy of the Company's tests being used at sites run by TestUtah.com.

55.     Defendant Satterfield was quoted in the article, reassuring the public that the alleged inaccuracies were due to "population differences".

56.     In response to the Tribune's questions, Defendant Satterfield reassured the market that the Company's tests were between 99.52% and 100% accurate in unspecified FDA and European studies.  Defendant Satterfield also said the Company had received no complaints from anyone the Company supplied tests to in 50 countries.

57.     On May 1, 2020, the Company issued a press release entitled: "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations."  The press release stated that the Company's Covid-19 tests were 100% accurate based on data gathered from across the world:

> Co-Diagnostics, Inc. (Nasdaq: CODX), a molecular diagnostics company with a unique, patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to determine accuracy in molecular diagnostics testing.
>
> The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations were conducted in Mexico by the Mexican Department of Epidemiology ("InDRE"), India, and elsewhere in the US and abroad. Each study concluded 100% concordance for both specificity and sensitivity.

58.     In the press release, Defendant Satterfield did not mention that the tests might be less than 100% accurate -- abandoning his recognition that the tests were between 99.52% and 100% accurate.  Instead, Defendant Satterfield insisted that the Company's tests were 100% accurate based on the experimental data:

In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Brent Satterfield, PhD said, "In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a standalone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, *we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that*." [Emphasis added].

59.     While in most situations, 99.5% accuracy and 100% accuracy are functionally equivalent, in diagnostic testing of diseases with a low population saturation, the difference can dramatically affect whether a test has any value to public health officials.

60.     For instance, in Utah Covid-19 testing has fairly consistently resulted in only 5% of apparently symptomatic test subjects testing positive for Covid-19.  That is, for every 1,000 tests, only about 50 people test positive.  However, even if the Company tests were 99.5% accurate — and it appears they are much less accurate than that — there would be five people who did not have the disease but who tested positive.  That is, one in ten people who tested positive would not have the disease.  At only slightly lower accuracy rates, the test becomes essentially worthless for public health testing and tracing.

61.     The Company results seemed to be even worse than these result rates would suggest.  For instance, the April 30th Tribune article reported that the Company tests being used by TestUtah.com resulted in only a 1% to 2% positive test rate even in symptomatic patients, suggesting that the Company tests were only accurately reporting half of the Covid-19 infections, suggesting an accuracy rate even worse than the 99.5% that the Company initially claimed and infinitely worse than the 100% accuracy rate the Company began to tout in early May.

62.     However, the market accepted the Company's false claims of 100% accuracy, resulting in an increase to the Company's share price.  For instance, the following publications

repeated the Company claims:

- "Co-Diagnostics (CODX) said Friday its coronavirus test has proven 100% accurate in field testing — leading CODX stock to rocket." Allison Gatlin, <u>Investor's Business Daily</u>, "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate."

- "Co-Diagnostics says coronavirus test shows spotless sensitivity data in independent evaluations" <u>Proactiveinvestors.com</u>

- "Co-Diagnostics Is a Smart Way to Play Coronavirus Testing: The Company's tests are reportedly 100% accurate in at least three countries" Louis Navellier, <u>Investorplace.com.</u>

63.     The Company did not release any clarifying statement about the accuracy of its test and has not addressed the allegations in public filings or press releases.

64.     The Company's stock continued to rise in May, as investors anticipated an earnings announcement and financial report for the first quarter of 2020 on May 14, 2020 after markets closed.

65.     The Company's plan to repress negative reports about its tests seemed to work. On May 14, 2020, the stock reached an all-time high of $29.72, a significant increase from its $0.8952 year-end 2019 price.

66.     However, the Company's claims of test accuracy became unsustainable.

67.     On May 14, 2020, third parties revealed information about the Company's allegedly 100% accurate test.

68.     <u>The Salt Lake Tribune</u> reported that TestUtah.com, which used tests developed by the Company, "declined to join other major Utah labs in a joint experiment to confirm one

another's quality." Moreover, The Salt Lake Tribune revealed that TestUtah's tests [by the Company] "have a higher 'limit of detection' — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury." This meant that the Company's tests were likely to have a much higher false negative reporting rate, meaning that potentially thousands of infected people were inaccurately told that they did not have the disease, an observation that was consistent with earlier concerns about TestUtah's lower rate of positive test results.

69.    The Tribune article also expressed concern relating to TestNebraska.com and TestIowa.com, testing services that also used the Company tests.

70.    Also, on May 14, 2020, Iowa Governor Kim Reynolds issued a public statement saying, "I'm pleased to announce that the State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives." These results did not comport with statements previously made by the Company on May 1, 2020.

71.    Indeed, Defendant Satterfield recently confessed that the lower positive rates for the Company's tests "has certainly got all of us scratching our heads a bit," and that the tests will correctly identify 95% of true positive results—a massive discrepancy from the Company's representations of 100% accuracy given that the tests are intended to be administered among hundreds of thousands or even millions of people.

72.    Based on the release of third-party information casting serious doubt as to the Company's bold claims of 100% accuracy, the stock price began to fall, closing the day at $22.13 after hitting an intra-day low of $18.35, a greater than 38% decrease in price within hours.

73.     At that point, the Company could have, but did not, revise its claims of 100% test accuracy, given that the Company released earnings and first quarter 2020 financials to the public after hours and had a scheduled investor call for the same evening.

74.     The Company did report that it achieved record sales and that the start-up had finally, after nearly 7 years, reached profitability; however, it did not address the testing accuracy or sensitivity allegations or correct Defendant Satterfield's prior statements about tests being 100% accurate.

75.     Rather, the call was described by The Gazette, a Cedar Rapids, Iowa publication covering TestIowa.com as sounding "more like Thanksgiving with drunk uncles — dogs were barking, people were swearing, and someone was moaning." The Gazette also accurately noted that "[n]one of Co-Diagnostics or Nomi Health's news releases about the Logix Smart tests have revealed how many tests have been sold, for how much, and so far all three testing initiatives in Iowa, Nebraska and Utah have been secretive about the tests and the results."

76.     The same day, the FDA issued a press release about testing accuracy.  Another, much larger drug company had created a diagnostic test for Covid-19 that was under increasing public scrutiny for apparent inaccuracy.  The FDA announced that "[t]he FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test.  *No diagnostic test will be 100% accurate* due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly." (Emphasis added).

77.     Based on the multiple third-party sources revealing serious problems that were

known, or should have been known, in advance of May 14, 2020, the stock price further fell to just over $15 per share when markets opened on May 15, 2020.

78.     By May 20, 2020, a statistician, Zhiyuan Sun, wrote an article about the Company's allegedly 100% accurate Covid-19 test:

> In May, Co-Diagnostics announced its COVID-19 in vitro test had been found to have 100% accuracy, 100% specificity (likelihood of preventing a false-negative error), and 100% sensitivity (likelihood of preventing a false-positive error), as per independent verification in laboratories across the world

*     *     *

> **The devil is in the details**
>
> To start off, Co-Diagnostics came to the conclusion that its test was 100% effective on all three diagnostic dimensions (specificity, accuracy, and sensitivity) based on studies with small sample sizes. For example, laboratory testing of the Logix test kit conducted in Australia involved about 100 COVID-19-positive patients and 100 COVID-19-negative patients. With a sample size that small, a low error rate, say 1% to 2%, could be really hard to detect. In fact, the study itself explicitly stated that the test could in fact be between 96% to 98% effective, rather than 100%.
>
> In addition, the testing environment is by no means indicative of the actual prevalence of COVID-19 in the population at this point in the pandemic. Among the test samples, 50% contained SARS-CoV-2, and obviously, at this point, nowhere near half the people in the world have been exposed to the coronavirus. "But wait a minute!" the intelligent reader might say. "Nothing in the world is perfect, so who cares if a test's results are off by 1% or 3%? Effectiveness of 97% is still nothing short of an A-plus. You're just being a devil's advocate, Zhiyuan!" Unfortunately, this is one of the cases where it is critical to pay attention to the devil in the details. In fact, a 1% or 3% error rate can render a in vitro test almost useless. Here's why.
>
> Let us assume, for the sake of argument, the true sensitivity of Logix is 98%, and its true specificity is also 98%. In other words, the probability of the test delivering a false positive is 2%, and the probability of the test returning a false negative is also 2%. Both of these values are directly stated as being probable in studies citing Logix's range of effectiveness, and they are valid assumptions given that the test has not been fully vetted by the FDA or other regulators. It is also common knowledge that because there are not enough viral tests for the COVID-19, the number of people who have the virus is likely to be significantly higher than official

figures. For example, it is estimated that up to 4.1% of the residents of Los Angeles County have COVID-19 antibodies. Let's use that 4.1% figure in our calculations as a measure of prevalence of COVID-19 (a lower prevalence would hurt the test even more). Assuming 1 million people are given the Logix test, 41,000 should test positive for an ongoing SARS-CoV-2 infection. However, if the test provides a false negative 2% of the time, only 98% of those 41,000 -- 40,180 -- would show up as positives.

On the other hand, out of the 959,000 people who were actually negative for the virus, a 2% error rate would yield 19,180 cases of false positives -- individuals who don't have the disease despite the test saying they do. All told, that makes 59,360 people getting positive results, but only 40,180 of them would actually be positive. That yields a predictive value of 67.7%.

79.     The Company knew that even a highly accurate test—such as 96%, 98%, or even 99%—was not the same, and not remotely as valuable, as a 100% accurate test.  That is because having a 100% accurate test would have significantly distinguished the Company from other larger, more reputable competitors introducing Covid-19 tests into the marketplace.  Also, because the widespread administration of a Covid-19 test that is even minimally inaccurate can have highly adverse public health consequences.  The Company knew this—and so it intentionally issued statements to the public to fend off truthful analysis and scientific skepticism about its supposed miracle test.

## V.     **FIDUCIARY DUTIES OF DEFENDANTS**

80.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all

shareholders equally.

81.     Each director and officer of the Company owes to Co-Diagnostic and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

83.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84.     Defendants, by virtue of their positions as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of Defendants who were also officers and directors of the Company has been ratified by the remaining Defendants who collectively comprised the Board at all relevant times.

85.     As senior executive officers and directors of a publicly-traded company whose

common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

86.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(b)     remain informed as to how Co-Diagnostic conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(c)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Co-Diagnostic and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause

independent investigation to be made of, said reports and records;

(d)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Co-Diagnostic's operations would comply with all applicable laws and Co-Diagnostic's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(e)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(f)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(g)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87.    Each of the Defendants further owed to Co-Diagnostic and the shareholders the duty of loyalty requiring that each Defendant favor Co-Diagnostic's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

88.    At all times relevant hereto, Defendants were the agents of other and of Co-Diagnostic and were at all times acting within the course and scope of such agency.

89.     Because of their advisory, executive, managerial, and directorial positions with Co-Diagnostic, each of the Defendants had access to adverse, non-public information about the Company.

90.     Defendants, because of their positions of control and authority were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Co-Diagnostic.

## VI.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants caused the Company to conceal the true facts as alleged herein.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

92.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

93.     Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each Defendant, who are directors of Co-Diagnostic, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

94.     Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

95.     At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Co-Diagnostic and was at all times acting within the course and scope of such agency.

## VII.   DAMAGES TO THE COMPANY

96.     As a direct and proximate result of Defendants' conduct, has lost and expended, and will lose and expend, many millions of dollars.

97.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98.     As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## VIII.   DERIVATIVE ALLEGATIONS

99.     Plaintiff brings this action derivatively and for the benefit of the Company to

redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of the Company, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

100.    The Company is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

101.    Plaintiff is, and has continuously been at all relevant times, a shareholder of the Company.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## IX.    DEMAND FUTILITY ALLEGATIONS

102.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

103.    A pre-suit demand on the Board is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following five (5) individuals: Defendants Egan, Durenard, Murphy, Nelson, and Serbin (the "Director-Defendants").  Plaintiff needs only to allege demand futility as to three of these five Directors.

104.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact.

105.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially

false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Defendants Egan**

106.    Demand is excused because Defendant Egan serves as the CEO and President. Defendant Egan receives compensation from the Company, including $460,000 in the fiscal year ended December 31, 2019.

107.    The principal professional occupation of Defendant Egan is his employment with the Company as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.

108.    Defendant Egan also was responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein. As Chairman of the Board, CEO and President, Defendant Egan conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Egan signed, and personally made the false and misleading statements in the May 15, 2020 Form 8-K, in addition to falsely representing that the Company's COVID-19 test was 100% accurate in the Company's press releases.

109.    Defendant Egan is also a defendant in the Securities Class Action.

**Defendant Durenard**

110.    Defendant Durenard served as a Company director since June 2019 and serves as Chairman of the Audit Committee.  As the Chairman of the Audit Committee, Defendant Durenard conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

111.    Defendant Durenard is also a defendant in the Securities Class Action.

112.    Thus, demand upon him is futile and therefore, excused.

**Defendant Murphy**

113.    Defendant Murphy has served as a Company director since June 2019 and serves as a member of the Audit Committee.  As a member of the Audit Committee, Defendant Murphy conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

114.    Defendant Murphy is also a defendant in the Securities Class Action.

**Defendant Serbin**

115.    Defendant Serbin has served as a Company director since May 2017 and serves as a member of the Audit Committee.  As a member of the Audit Committee, Defendant Serbin conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

116.    Defendant Serbin is also a defendant in the Securities Class Action.

**X.     CAUSES OF ACTION**

<u>**COUNT I**</u>

**(Against Defendants For Contribution Under**
**Sections 10(b) And 21D Of The Exchange Act)**

117.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

118.     Defendants are named as defendants in the related Securities Class Action. The conduct of Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

119.     The Company is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

120.     As officers, directors and otherwise, Defendants had the power or ability to, and did, control or influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

121.     Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

122.     Defendants have damaged the Company and are liable to the Company for contribution.

123.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II

### (Against Defendants For Breach Of Fiduciary Duties)

124.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

125.     Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

126.     Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

127.     Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

128.     Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

129.     In further breach of their fiduciary duties, Defendants failed to maintain an

adequate system of oversight, disclosure controls and procedures, and internal controls.

130.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

### COUNT III

### (Against Defendants for Waste of Corporate Assets)

131.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

133.   As a result of the waste of corporate assets, Defendants are each liable to the Company.

134.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## XI.   REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for

amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## XII.   <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 2, 2020

**ANDERSON & KARRENBERG**

By: *<u>/s/ Jason E. Greene</u>*
    Jason Greene
50 West Broadway, Suite 700
Salt Lake City, UT 84101
Email: jgreene@aklawfirm.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
501 Fifth Avenue South, 19th Floor
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

**<u>VERIFICATION</u>**

I, MELVYN KLEIN, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Co-Diagnostics, Inc. and authorize its filing.   I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of Co-Diagnostics, Inc. common stock as set forth in the Complaint.


Dated: December 1, 2020


*/s/ Melvyn Klein*
MELVYN KLEIN